UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| HOMER A. LINDSAY, <br> AND ALETA G. LINDSAY <br><br> Plaintiffs <br><br> VS. <br><br> RADIATOR SPECIALTY COMPANY <br><br> Defendants | CIVIL ACTION NO.: <br><br> SECTION: <br><br> JUDGE: <br><br> MAGISTRATE: |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## Original Complaint

The plaintiffs, Homer A. Lindsay, et al, file this Original Complaint as follows:

**Parties**
1.

1. A. The Plaintiffs

The plaintiffs are:

   i.   **Homer A. Lindsay**, individually, who is of full age of majority and domiciled at 776 Solomon Drive, Covington, St. Tammany Parish, Louisiana 70433.

   ii.  **Aleta G. Lindsay**, individually, who is of full age of majority and the wife of Homer A. Lindsay, domiciled at 776 Solomon Drive, Covington, St. Tammany Parish, Louisiana 70433.

   B. The Defendants

The defendant is:

1. **Radiator Specialty Company**, a North Carolina corporation, with its principal business office in North Carolina, and whose mailing address is 1900 Wilkinson Boulevard, Charlotte, North Carolina 28208 and whose agent for service of process is Ronald Weiner, 600 Radiator Rd., Indian Trail, North Carolina 28079.

2.

This Court has jurisdiction under 28 U.S.C. § 1332 in that there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

3.

This Court has personal jurisdiction over the defendant who is doing business in the district or who did business in this district at a relevant time.

4.

The defendant is incorporated under the laws of North Carolina, with it's principal places of business in North Carolina. Homer A. Lindsay and Aleta G. Lindsay are domiciled in St. Tammany Parish, Louisiana. The Defendants is not domiciled in Louisiana. Therefore, there is complete diversity in this matter.

5.

Venue is proper in this district under 28 U.S.C. § 1391 (b)-(c) because the Defendant is doing business in this district.

**Background**

6.

Mr. Lindsay worked at New Orleans Public Services, Inc. (hereinafter referred to as" NOPSI") which is located in Orleans Parish, Louisiana. NOPSI was a power utility plant. Mr. Lindsay worked at NOPSI performing maintenance, repairs, and instalation of instruments, controls, and piping from October 1971 through December 1986. Mr. Lindsay worked with Radiator Specialty Co.'s product "Liquid Wrench" from 1971 to 1978 while performing working at NOPSI.

7.

From 1971 to 1978 Mr. Lindsay performed various tasks at NOPSI and which required the use of Liquid Wrench. Mr. Lindsay was exposed to the benzene in Liquid Wrench while performing maintenance work and other tasks. This work used substantial amounts of Liquid Wrench.

8.

Radiator Specialty Co. was the manufacturer, distributor and seller of the benzene containing product, Liquid Wrench, to which Mr. Lindsay was exposed.

9.

As a result of his exposure to the benzene in Liquid Wrench, Mr. Lindsay suffered damage to his bone marrow and blood forming organs, resulting in multiple myeloma.

10.

Mr. Lindsay sustained tissue damage from each exposure to benzene in Liquid Wrench, resulting in distinct bodily injuries in every year from 1971 through 1978.

11.

As a direct and proximate result of exposure to benzene in Liquid Wrench, Mr. Lindsay suffered injury including, but not limited to multiple myeloma, physical damage, severe physical and mental pain, fear of further disease processes, disability, medical expenses, and loss of enjoyment of life.

12.

The development of multiple myeloma as a result of chronic benzene exposure has been well documented, and death resulting from multiple myeloma has been associated with benzene exposure.

13.

Multiple myeloma is a malignant disease that affects the blood and bone marrow. Scientists have also linked other blood disorders such as myelodysplastic syndrome (MDS), aplastic anemia, pancytopenia, cytopenias, myelofibrosis, CLL Leukemia, ALL Leukemia, AML leukemia and polycythemia vera to benzene exposure.

14.

The latency period for the development of injuries after benzene exposure has been known to range from less than 5 years to in excess of 50 years.

15.

Practically all of the adverse chronic effects of exposure to benzene and its oxidation products are a result of its insidious influence on the blood forming system.

16.

The health hazards of benzene have been recognized by the petroleum and chemical industries for over one hundred years. Benzene has been recognized as a carcinogen known to cause leukemia. By the end of 1948, it was widely known to those in industry in the United States, as well as the named Defendant and their predecessors, that exposure to benzene could cause a myriad of ill health effects including such diseases as leukemia, multiple myeloma, lymphoma and other blood disorders.

17.

Through industry and medical studies unknown to plaintiffs, the Defendant knew or should have known of the health hazards inherent in the products it manufactured, distributed, sold, supplied, owned, transported, or used. The actions or inactions of the Defendant constitutes gross negligence and demonstrate a reckless disregard for the

rights and safety of others.

18.

Furthermore, the Defendant committed numerous tortious acts that include, without limitation, negligently misrepresenting, concealing, suppressing, omitting material information about the health effects of benzene and failing to inform users of precautionary measures to be used when handling or near benzene, as specifically alleged below.

19.

Exposure to benzene occurs through inhalation and skin contact. Chronic benzene poisoning results from repeated or continuous exposure to relatively low concentrations of benzene vapors.

20.

Long-term benzene exposure may adversely impact marrow and bone production. Breathing benzene can cause drowsiness, dizziness, rapid heart rate, headaches, tremors, confusion, and unconsciousness. Breathing very high levels of benzene can also result in death. Eating or drinking foods containing high levels of benzene can cause vomiting, irritation of the stomach, dizziness, sleepiness, convulsions, rapid heart rate, and death.

21.

In the September 1948 Edition of the American Petroleum Institute, Toxicological Review Benzene, the authors recommended precautionary measures for workers who are exposed to benzene. Furthermore, the review stated that benzene use was extensive in the petroleum industry.

22.

As of 1948, the American Standards Association and most states had set an arbitrary limit of 100 ppm as the maximum permissible benzene concentration for workers exposed to this substance during an 8-hour day. In 1948, the American Petroleum Institute reported that "In as much as, the body develops no tolerance to benzene, and as there is a wide variation to individual susceptibility, it is generally considered that the only absolute safe concentration for benzene is zero." 1948 API, Benzene Toxicological Review. The concentration of benzene vapor in the air should be checked regularly in situations where excessive exposures are apt to be encountered.

23.

The safety measures necessary for the prevention of benzene poisoning are primarily those designed to prevent the inhalation of benzene vapor. Ventilation should be designed to prevent toxic concentrations of the vapor from reaching the breathing zone of individuals who may potentially be exposed. Individuals who must be exposed to benzene vapor should be rotated to reduce their exposure time to a minimum. When excessive concentrations are unavoidably encountered in operations—such as the cleaning in vats or tanks—a supplied air respirator or self-contained breathing apparatus with full face shield should be employed. Skin contact and possible dermatitis from benzene should be avoided entirely if possible; but, if the hands must contact the solvent, then neoprene gloves should be used.

24.

The defendant, Radiator Specialty Co. knew or should have known about the causal relationship between benzene and cancer-related illnesses. The Defendant failed

to warn Mr. Lindsay about the health hazards associated with benzene in Liquid Wrench with Raffinate. Radiator Specialty Company knew or should have known that Raffinate in Liquid Wrench contained dangerous levels of benzene, which posed a health hazards to users of their products.

25.

The Defendants have committed negligence, gross-negligence and are strictly liable for the damages caused. Defendant's are at fault for Mr. Lindsay's injuries as outlined in this complaint.

26.

When the Mr. Lindsay inhaled, dermally absorbed, or otherwise ingested, Liquid Wrench and its constituent components, including but not limited to benzene, it caused irreparable harm and progressive damage to the blood and blood forming organs, including multiple myeloma.

**Negligence**

27.

Louisiana C.C. 2315 provides, "Every act whatever of man that caused damages to another obliges him by whose fault it happened to repair it." Radiator Specialty Co. is liable to Mr. and Mrs. Lindsay for the damages caused by Mr. Lindsay's exposure to benzene containing Liquid Wrench while performing working with Liquid Wrench in a reasonably foreseeable manner at the NOPSI plant in New Orleans, Louisiana from 1971 to 1978.

28.

Manufacturers such as Radiator Specialty Co. have a duty to design reasonably safe products, to use due care in conducting approximate testing of their products, and to market products free of manufacturing defects.

29.

Radiator Specialty Co. was negligent by failing its duties to design reasonably safe products, to use due care in conducting appropriate testing of its products, and to market products free of manufacturing defects, when manufacturing and designing its product Liquid Wrench.

30.

Radiator Specialty Co. manufactured and distributed Liquid Wrench. Radiator Specialty Co. knew that its products, Liquid Wrench, contained 89% Raffinate. Radiator Specialty Company also knew Raffinate contained up to 14% benzene (with a minimum of 5% benzene). Radiator Specialty Company knew its product, Liquid Wrench, contained unsafe levels of benzene including reports of up to 30%.

31.

As early as 1950, Radiator Specialty Company had been producing an alternative formula of Liquid Wrench (sometime referred to as the deodorized or aerosol formulations) which did not contain raffinate or benzene. In spite of the availability of this safer formulation of Liquid Wrench, Radiator Specialty Co. continued manufacture the hazardous, benzene containing, Liquid Wrench, up until 1978.

32.

Radiator Specialty Co. breached duties owed to Mr. Lindsay and the plaintiffs to exercise proper care in manufacturing and selling their respective products.

More specifically, they breached the following duties:

**a.** to design their products to contain available and suitable components other than benzene;
**b**. to sell benzene-free products;
**c.** to fully test their respective products for health risks associated with the normal, intended and foreseeable use of their products;
**d.** to refrain from manufacturing and selling products containing unsafe levels of benzene;
**e.** to design their product to contain non-hazardous ingredients, and to not contain benzene;
**f.** to recall their products upon discovering, or at the time they should have discovered, the health hazards associated with those products;
**g.** to fully inspect, test, investigate and research the safety and health risks of the products they sold;
**h.** to research, study and be aware of medical and scientific studies concerning the health hazards of benzene; and
**i.** other acts which may be revealed at the trial of this matter.

33.

Radiator Specialty Co. knew or should have known that their products posed a significant risk of harms to the users, potentially causing blood disorders and blood cancers.

34.

Radiator Specialty Co. knew or should have known that users of their product (Liquid Wrench with Raffinate) were exposed to hazardous levels of benzene.

35.

As a direct and proximate result of the Defendants' negligent breach of their duties, the Plaintiffs have sustained injuries, damages and losses. The scope of the duties breached by the defendant encompass the risk of the injuries sustained by the Plaintiffs. The duties breached were intended to protect the Plaintiffs from the type of injuries they

have sustained. The Defendants' breaches of their duties constitute the direct legal cause of the injuries to the Plaintiffs.

36.

The Federal Hazardous Substance Acts, 15 USC §§1261-1278, and its predecessor, the Federal Substances Labeling Act, do not bar, preempt or prohibit non-warning claims, such as those asserted by the Lindsay's, which "require manufactures to design reasonably safe products, to use due care in conducting appropriate testing of their products, to market products free of manufacturing defects, and to honor their express warranties or other contractual commitments." *Wagoner v. Exxon Mobil*, Docket No 09-7257, Order & Reasons, of June 3, 2011(Attached as "**Exhibit A**").

**Strict Product Liability**

37.

Exposure to benzene from the Defendants' products and/or products under their care, custody and control resulted from the normal, foreseeable, and intended use of the products, without substantial change in the condition in which the defendants sold or supplied these products. Defendants Radiator Specialty Co. is strictly liable for the damages caused by its products.

38.

The Defendants' products were defective, presented an unreasonable risk of harm, and were unreasonably dangerous under normal use at the time the products left the respective defendants' control.

39.

Mr. Lindsay was an intended and foreseeable user of the alleged defective

products. Radiator Specialty Co. could reasonably have anticipated the damages and losses to the Plaintiffs.

40.

Defendants Radiator Specialty Co. sold their products with conscious disregard for the safety of users of the products and other persons who might be injured thereby.

41.

Defendant, Radiator Specialty Co., is strictly liable for the damages caused by its product, Liquid Wrench, because its product was 1) Unreasonably dangerous per se; 2) Unreasonably dangerous in construction; and 3) Unreasonably dangerous in design; *Halphen v. Johns-Manville Sales Corp.,* 484 So.2d 110 (La. 02/24/86).

42.

Defendants' products were unreasonably dangerous in construction or composition. At the time these products left control of the manufacturer, they contained high concentrations of a cancer causing substance, benzene, which made the products more dangerous than they were designed to be.

43.

Radiator Specialty Co.'s products were unreasonably dangerous per se. The danger of use of the products, Liquid Wrench with Raffinate, whether foreseeable or not, outweighed the utility of the products.

44.

Radiator Specialty Co.'s products were unreasonably dangerous in design. These products were manufactured with constituents that contained high levels of benzene. Less toxic and cheaper design alternatives were available at the time of manufacture.

45.

Radiator Specialty Co.'s products were unreasonably dangerous in design. Radiator Specialty Co. failed to conduct adequate research and investigation into the health effects of their products.

46.

As the product designers and manufacturer, Radiator Specialty Co had a duty to keep abreast of scientific knowledge and discoveries. Radiator Specialty Co. had a duty to test and inspect their products. Defendants' breached these duties.

47.

As a result of the defective and unreasonably dangerous condition and composition of the benzene-containing products manufactured, distributed and/or sold by all defendants, Mr. Lindsay inhaled benzene fumes and other harmful substances emitted by the normal use of the products, proximately causing multiple myeloma related to benzene exposure from which he suffers and for which these defendants are strictly liable under Louisiana law.

48.

The defects in the Defendant's products include, but are not limited to, the following:

**a.** The products were unreasonably dangerous per se in that the damage in fact of using the product outweighs the utility of the product under normal, foreseeable use.
**b.** The products are unreasonably dangerous per se because the cost of injuries as a result of the benzene content of the products, outweighed the benefits of use of benzene in the product;
**c.** The products inherent characteristics (known to the defendants) gave the products such a potential for causing health problems as to render the products unreasonably dangerous per se;
**d.** lack of reasonable research and study of their products to ensure that they were fully knowledgeable of any dangerous constituents, or of any health risks from the use of

    the product.
**e.** lack of tests or lack of sufficient tests to determine the effect of benzene vapors on intended users and bystanders;
**f**. failing to design their respective products so as not to emit dangerous levels of benzene;
**g.** Providing benzene containing products which, by virtue of their design and/or manufacture and/or composition, were unreasonably dangerous under reasonably anticipated use;
**h**. Failing to properly test the benzene containing product to properly evaluate the level of emissions of benzene under foreseeable conditions for extended periods of time;
**i.** Failing to warn each user of the unreasonably dangerous nature of the benzene;
**j.** defective designs calling for the inclusion of benzene in products that did not require benzene, when alternative, equally suitable substances were available, and
**k**. other acts which may be revealed at the trial of this matter.

### Damages Sustained by Mr. Lindsay's Wife

49.

Due to the Radiator Specialty Co.'s fault as described above and because of the benzene-related injuries of Mr. Lindsay, the plaintiffs have suffered loss of consortium, loss of services, loss of affection, and loss of nurture and are entitled to damages as are reasonable.

50.

Due to the Radiator Specialty Co.'s fault described above, Mrs. Lindsay has suffered and will continue to suffer emotional distress. The mental distress caused by Mr. Lindsay's terminal illness, and death have adversely affected Mrs. Lindsay.

### Compensatory Damages

51.

As a result of the acts and omissions of Radiator Specialty Co., the Plaintiffs are entitled to recover money damages, both past and future, for all elements of damages allowed by Louisiana law. These damages include but are not limited to:

     **a.** Past, present, and future physical pain and suffering;
     **b**. Past, present, and future mental anguish and emotional distress;
     **c.** Disfigurement and embarrassment;
     **d**. Physical impairment;
     **e**. Past and future earnings;
     **f.** Lost earning capacity;
     **g**. Physical Impairment;
     **h**. Physical and mental disabilities;
     **i**. Past, present, and future medical care, convalescence, mental and physical therapy and all other health care expenses;
     **j.** Loss of enjoyment of life;
     **k**. Fear of cancer and other diseases;
     **l.** Expenses to train, educate or otherwise enable the plaintiffs to be gainfully employed;
     **m.** Loss of society, consortium, companionship, services, nurture, and love and affection;
     **n.** Wrongful death damages; and
     **o.** Survival damages.

## Discovery Rule/Contra Non Valentum

52.

The prescriptive period does not start until the plaintiffs knew or should have known that Mr. Lindsay's cancer was caused by benzene. Here, the result of the Mr. Lindsay's exposure to benzene was inherently undiscoverable. The cancer took years to develop, and even when the symptoms did manifest, neither the physicians, Mr. Lindsay, nor the plaintiffs detected the link between Mr. Lindsay's benzene exposures and his malignancies. Neither Mr. Lindsay nor the plaintiffs ever heard or saw anything that linked benzene to Mr. Lindsay's cancer. This cancer was the product of exposure to benzene over a period of time rather than at a point in time. Hence, the prescription period did not start until Mr. Lindsay and plaintiffs learned about the cause of his multiple myeloma. Mr. Lindsay was diagnosed with multiple myeloma in August 2011 and he learned of the connection of his multiple myeloma

to benzene exposure in 2012 which is within a year of filing of this suit.

### Jury Trial

53.

The plaintiffs pray for trial by jury.

### Prayer

54.

For these reasons, the plaintiffs ask that Radiator Specialty Company be cited to appear and answer, and that on final trial, the plaintiffs have Judgment against, Radiator Specialty Co., for any and all damages and the actual and special damages suffered by the plaintiffs as a result of defendant's conduct;

    **a.** Costs of suit;
    **b**. Prejudgment and post-judgment interest at the highest rate provided by law;and
    **c**. All other and further relief to which the plaintiffs may be entitled.

Respectfully Submitted:

*/s/ L. Eric Williams, Jr.*
L. Eric Williams, Jr. (La. Bar No. 26773)
**Williams Law Office, LLC**
433 Metairie Road, Ste. 302
Metairie, Louisiana 70005
Telephone: (504) 832-9898
Facsimile: (504) 832-9811
E-mail: eric@amlbenzene.net

**ATTORNEYS FOR PLAINTIFFS**